**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**SOUTH PACIFIC ISLAND AIRSYSTEMS, INC., GEORGE WRAY, SAMOA AVIATION, INC., dba, SAMOA AIR, & DOES 1-10, Defendants**

High Court of American Samoa
Trial Division

CA No. 13-94

June 5, 1995

--------

Before KRUSE, Chief Justice, and VAIVAO, Associate Judge.

Counsel: For Plaintiff, Cherie Shelton Norman, Assistant
Attorney General
For Defendant South Pacific Airsystems, Inc., Togiola
T.A. Tulafono
For Defendant Samoa Aviation, Inc., d.b.a. Samoa Air,
Marshall Ashley
For Defendant George Wray, *pro se*

Opinion and Order:

## INTRODUCTION

This case concerns competing claims over an interest in a parcel of American Samoa Government ("ASG") owned land ("hangar property") at the Pago Pago International Airport located in Tafuna, American Samoa. In this matter, ASG requests this Court to declare the respective rights and duties of the parties regarding the hangar property and the agreements made pertaining thereto. At the present time, both Samoa Aviation, dba Samoa Air ("SamAir"), and South Pacific Island Airsystems ("Airsystems") claim an interest in the hangar property. SamAir currently leases the hangar property from ASG on a month to month basis and intends to enter into long term lease negotiations with ASG, whereas Airsystems claims an interest in the hangar property as the result of a preexisting lease between South Pacific Island Airways ("SPIA") and ASG, which was later allegedly transferred by SPIA to Airsystems.[1] In other words, the essential issue is whether Airsystems has a present interest in the hangar property that would interfere in SamAir's attempt to

---

[1] George Wray, who was the president of both SPIA and Airsystems, incorporated Airsystems in an attempt to transfer SPIA's lease of the hangar property to Airsystems in apparent contemplation of inevitable SPIA bankruptcy proceedings.

negotiate and execute a long term lease with ASG.

## FACTS

On June 10, 1977, ASG leased the hangar property to SPIA for a fifteen year term. This lease ("SPIA lease") was signed by the president of SPIA, George Wray ("Wray") and acting Governor Lyle L. Richmond, but for reasons unknown it was not registered with the Territorial Registrar. Sometime thereafter, SPIA took possession of the hangar property, constructed a portable aircraft hangar structure, and began paying rent to ASG until 1985.[2]

In March, 1985, shortly before SPIA filed for bankruptcy, Wray devised a scheme to protect SPIA's assets from becoming property of the bankruptcy estate. First, on March 11, 1985, Wray incorporated Airsystems under the laws of American Samoa. Two days later, Wray, as president of both SPIA and Airsystems, attempted to assign SPIA's rights to the hangar property to Airsystems through a "Quitclaim Deed and Use Agreement" ("Quitclaim Deed") in consideration of $10.[3] The Quitclaim Deed was executed without ASG's acquiescence and it was not filed with the Territorial Registrar.

On June 19, 1985, SPIA filed for Chapter 11 bankruptcy in United States Bankruptcy Court, District of Hawaii. Despite Wray's attempt to transfer the SPIA lease to Airsystems, the lease along with SPIA's other assets, became property of the bankruptcy proceeding. ASG filed a claim in the bankruptcy proceeding to collect unpaid rent owed by SPIA for use of the hangar property.[4]

On February 28, 1987, SPIA's Chapter 11 bankruptcy was changed to a Chapter 7 and its operations and assets were transferred to Trustee Richard Kennedy ("Trustee"). The Trustee assumed SPIA's obligations under the SPIA lease and surrendered possession of the hangar property to ASG. ASG operated SPIA's business out of the hangar property until October

---

[2] On February 2, 1990, the hangar structure was destroyed by Hurricane Ofa. SamAir, who had a valid lease at that time, was permitted by ASG to remove the wreckage from the hangar building.

[3] Airsystems, who did not receive a business license in American Samoa until 1991, has never paid rent to ASG for the hangar property.

4 According to the evidence offered at trial, SPIA owed $2,337,883.43 in rent to ASG as of July 30, 1988, for use of the hangar property.

28, 1988, when SamAir obtained most of SPIA's assets, excluding the hangar structure and SPIA lease, as a result of the bankruptcy proceedings.

On December 30, 1988, ASG leased the hangar property to SamAir for a five-year term. The lease was signed by then Governor A.P. Lutali and was filed with the Territorial Registrar on January 5, 1989. A few days later, the Deputy Territorial Registrar incorrectly attempted to void the lease, citing certain irregularities. On the basis of this purported retroactive rejection by the Territorial Registrar's office, ASG filed an action, docketed CA No. 56-89, with this Court against SamAir for recovery of the hangar property. In response, SamAir filed an action, docketed CA No. 49-89, claiming that ASG, Wray, and Airsystems had entered onto the hangar property in violation of SamAir's lease.

In the first matter, CA No. 56-89, this Court on June 30, 1989, held that the five-year lease between ASG and SamAir was valid and enforceable.[5] *See American Samoa Gov't v. Samoa Aviation, Inc.*, 11 A.S.R. 2d 144, 153 (Trial Div. 1989), rehearing denied 13 A.S.R. 2d 65 (1989). In CA 49-89, we issued a preliminary injunction on October 25, 1990, restraining ASG, Wray, and Airsystems from interfering with SamAir's lease of the hangar property.[6] *See Samoa Aviation, Inc., v. American Samoa Gov't, George Wray, Airsystems, Inc., Does I-X*, CA No. 49-89, slip op. (Trial Div. Oct. 25, 1990) (Order Granting Injunctive Relief). SamAir's five-year lease expired on its own terms on December 29, 1993, and has been extended on a month to month basis.

Despite our decision in CA No. 56-89, entered June 30, 1989, that SamAir had a valid lease, the following events raised questions about the current status of the hangar property: 1) Airsystems, in a letter dated March 10, 1992, notified ASG that it wished to exercise the option to extend the SPIA lease;[7] 2) On March 18, 1992, the Attorney General rejected Airsystems' request and notified them that the SPIA lease would terminate on March 31, 1992; 3) On December 29, 1992, and three days

---

[5] Neither SPIA nor George Wray were parties to this action.

[6] This matter remains pending.

[7] Article II of the SPIA lease stated that the lease "shall expire and terminate on June 30, 1992," and that SPIA "shall have the option of renewing the lease for an additional fifteen year term" if agreed upon "by the parties three (3) months prior to the expiration of this lease."

before leaving office, Governor Peter T. Coleman signed a letter to Airsystems purporting to cancel the Attorney General's earlier March 18 letter.

On January 12, 1994, ASG filed this action seeking declaratory relief on the respective rights and duties of the parties in this action regarding the hangar property and pertinent agreements thereto. The action against Wray was subsequently dismissed after he declared in court that he no longer had any further interest in the entity Airsystems.

## DISCUSSION

### I. SPIA Lease

Airsystems alleges the execution of a valid ground lease with ASG, on June 30, 1977, of the hangar property for a fifteen year term. While ASG does not contest the validity of the SPIA lease prior to SPIA's bankruptcy in 1985, SamAir argues that this lease was never properly executed in the first place. We agree.

In American Samoa, a lease between ASG and a private party must be in accordance with certain statutory requirements. For example, A.S.C.A. § 30.0131 provides that no corporation "may buy or acquire *any interest in land* unless the transaction is approved in writing by the Governor and recorded by the Territorial Registrar, and *no such acquisition or transfer may be of any effect until so approved and recorded*" (emphasis added). In addition, A.S.C.A. § 37.0210(a) states that "[n]o instrument shall be effectual to pass the title to any land *or any interest therein* . . . until such instrument has been duly registered with the territorial registrar" (emphasis added).

Airsystems argues that §§ 30.0131 and 37.0210(a) did not become effective in American Samoa until 1982, and therefore do not apply to the SPIA lease, which was executed in 1977. This claim is not only factually incorrect, but a misinterpretation of the legislative history of these statutes. Even a cursory reading of the annotations to these enactments reveal that they were enacted into law in 1962 and readopted in 1982. *See also* XI Code Am. Samoa, 1961 Ed. § 11.0121, 14 A.S.C.A. § 202; and X Code Am. Samoa, 1961 Ed. § 10.0102, 27 A.S.C.A. § 601, respectively. The SPIA lease was never registered with the Territorial Registrar; it is, therefore, invalid and ineffectual. A.S.C.A. §§ 30.0131 and 37.0210(a).

78

■ Airsystems claims that this Court, in *American Samoa Government v. South Pacific Island Airways, Inc.*, CA No. 91-82, slip op. (Trial Div. May 11, 1984) (Findings, Conclusions and Order, entered), held that the SPIA lease was valid. We recognize the fact that in CA No. 91-82, we entered a finding that SPIA had valid leases for office space, a ticket counter, and a hangar tie down and service area with ASG. This finding, however, was entered on SPIA's stipulation that rent in the amount of $21,624.33 was due and owing to ASG at the time. *See id.* at 5. This finding was intended to show that SPIA had taken possession of the hangar property and owed ASG $21,624.33 in unpaid May 11, 1984, rent for use of the premises. Our decision in CA No. 91-82 did not address the question of whether or not the SPIA lease itself was executed in accordance with the law. We do take notice that SPIA took possession of the hangar property and that ASG accepted rental payments from SPIA during this term, but that does not change the fact that the parties had failed to properly execute the SPIA lease in accordance with applicable statutory mandate. Instead, the consensual agreement between ASG and SPIA merely created a tenancy at will relationship. Case law abounds that a lessor's failure to execute a lease results in a tenancy at will. *Kehoe v. Schneider*, 378 N.E.2d 1000, 1001 (Mass. 1978). "One may become a tenant at will or a periodic tenant under an invalid lease, or without a lease at all, by occupancy with consent." *Ellingson v. Walsh O'Connor & Barneson*, 104 P.2d 507, 509 (Cal. 1940); *Barbee v. Lamb*, 34 S.E.2d 65, 66 (N.C. 1945).

> Where, in addition to entry into possession under an invalid lease, rent is paid and accepted under the lease, a periodic tenancy is created. By the payment and acceptance of such rent, the parties have given further indication of their intention to be bound by the invalid lease, and the period tenancy provides a measure of security to their expectations. The initial period is determined by the interval between the rent payments specified in the invalid lease.

*Kent v. Humphries*, 281 S.E.2d 43, 46 (N.C. 1981) (quoting RESTATEMENT (SECOND) OF PROPERTY, Landlord and Tenant § 2.3(d) (1977). In other words, when a tenant enters into possession under an invalid lease and tenders rent which is accepted by the landlord, a periodic tenancy is created. This is the rule in most jurisdictions. *Id.*

■ Accordingly, we hold that the SPIA lease was never executed in accordance with applicable law, but since SPIA took possession of the hangar property and ASG collected rent, a tenancy at will relationship was

created by the parties and was subject to termination at will by either party to the agreement. *Barbee v. Lamb*, at 66.

## II. Termination of SPIA Leasehold Interest

Since 1977, several events have occurred which effectively terminated SPIA's tenancy at will, as well as any right or interest claimed by SPIA or Airsystems in the hangar property. We will address these issues one at a time.

### A. Termination By Bankruptcy

On June 19, 1985, SPIA filed for a Chapter 11 bankruptcy in the U.S. District Court of Hawaii. The bankruptcy was later converted to a Chapter 7 proceeding and SPIA's operations and assets were transferred to the bankruptcy Trustee on February 28, 1987. ASG argues that even if the SPIA Lease was valid according to law, it was terminated by the bankruptcy Trustee's failure to assume or reject the SPIA lease within 60 days as required by 11 U.S.C. § 365(4). This statute governs the actions of a Trustee in dealing with unexpired leases and executory contracts, which are contracts that have yet been fully performed or completed. *Wagstaff v. Peters*, 453 P.2d 120, 124 (Kan. 1969); see *Black's Law Dictionary* 512 (5th ed. 1979). 11 U.S.C. § 365(4) provides in part:

> if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief . . . then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

*See also American Samoa Gov't v. Samoa Aviation, Inc.*, 11 A.S.R.2d at 145 (the SPIA lease was terminated automatically during the bankruptcy). Since the Trustee did not assume the SPIA lease within the necessary time limit, he was required to release the hangar property to ASG. As a result, ASG took possession of the hangar property, in July 1987, and began to operate the airline, effectively terminating SPIA's tenancy at will. Accordingly, we conclude that the bankruptcy proceeding itself terminated SPIA's tenancy at will, as well as, any other alleged interest in the hangar property.

### B. Termination By SamAir Lease

On October 28, 1988, the Bankruptcy Court issued an order, which

became effective on December 20, 1988, transferring SPIA's operations and assets, excluding the SPIA lease and the hangar structure, to SamAir. As a result, ASG was able to lease the hangar property to SamAir on December 30, 1988, for a five-year term. The lease was duly signed by the Governor and registered with the Territorial Registrar in accordance with A.S.C.A. §§ 30.0131 and 37.0210(a). Although the Territorial Registrar later attempted to reject the lease, this Court, in *American Samoa Government v. Samoa Aviation, Inc.*, 11 A.S.R. at 153, rehearing denied 13 A.S.R. 2d 65 (1989), held that the five-year lease between ASG and SamAir was valid and enforceable.[8] This decision effectively recognized the termination of SPIA's tenancy at will and, therefore, any remaining right or interest claimed by Airsystems in the hangar property.

## C. Termination By Emergency

On March 18, 1992, the Attorney General wrote and notified Airsystems that the SPIA lease was terminated effective March 31, 1992, due to an emergency. Article X of the SPIA lease provided that ASG may unilaterally terminate the lease if, in the sole opinion of the lessor, a state of emergency requires the use of the premises. We find that the Attorney General's letter dated March 18, 1992, would have been sufficient to terminate the SPIA lease, had it been valid, as well as terminating SPIA's tenancy at will or any interest thereby claimed by Airsystems in the hangar property.

## D. Termination In Accordance With Law

Even if the SPIA lease was valid, it would have terminated under its own terms on June 30, 1992. Article II of the SPIA lease provided that the lease "shall expire and terminate on June 30, 1992," unless it was renewed. It was not renewed. SPIA's tenancy at will, as well as any interest Airsystems alleges to have in the hangar property would have terminated, at the latest, on June 30, 1992.

## III. Airsystems' Interest

Airsystems claims a current interest in the hangar property arising from the Quitclaim Deed and the December 29, 1992, letter signed by Governor Coleman. Airsystems argues that the Quitclaim Deed assigned to it

---

[8] Neither SPIA nor Wray were parties to this action. The SamAir lease expired under its own terms on January 5, 1994, however, SamAir continues to lease the premises from ASG on a month to month basis pending the outcome of this case.

SPIA's rights to the lease, which was then extended by Governor Coleman's letter. We hold that Airsystems never had an interest in the hangar property.

## A. Quitclaim Deed

Airsystems alleges that on March 10, 1985, SPIA legally conveyed title to the hangar structure and assigned its rights under the SPIA lease to Airsystems through the execution of a Quitclaim Deed. First, since the SPIA lease was invalid, SPIA did not have any rights under the lease to assign. Second, even if the SPIA lease was properly executed, the Quitclaim Deed would nonetheless be invalid and of no legal effect for two reasons: 1) it was not executed with the approval of ASG as required by the SPIA lease; and, 2) it was not filed with the Territorial Registrar as required by §§ 30.0131 and 37.0210(a).

Article V of the SPIA lease stated that SPIA may not "at any time assign this lease or any part thereof without the *written* consent of lessor" (emphasis added). SPIA's attempt to assign its rights to the hangar property was done without ASG's written consent. The Quitclaim Deed contained only Wray's signature as the Chairman of the Board of Directors of both SPIA and Airsystems, but this instrument was never approved in writing by anyone on behalf of ASG. Second, the Quitclaim Deed was never registered with the Territorial Registrar. In fact, the evidence shows that ASG was not even aware that the Quitclaim Deed existed. From April 8, 1985, one month after the Quitclaim Deed was signed by Wray, until December 4, 1988, ASG continued to invoice SPIA $400 a month for use of the hangar property. In return, SPIA paid $4,000 of rent for that period of time and the remaining balance was paid by the bankruptcy Trustee. ASG never invoiced nor collected rent from Airsystems on the hangar property.

Accordingly, and even assuming for purposes of discussion that the SPIA lease was valid, we find that the Quitclaim Deed was neither executed with the written approval of ASG nor in accordance with A.S.C.A. §§ 30.0210 and 37.0131, and, therefore, hold that it is invalid and of no legal effect.[9]

## B. Lease Renewal

---

[9] The Quitclaim Deed, even if properly executed, was an executory contract that was never assumed by the bankruptcy trustee, and was, therefore, rejected by operation of law. 11 U.S.C. § 365(d)(4).

Article II of the SPIA lease provided that the lessee could opt to "renew" the lease for an additional fifteen year term, if agreed upon by the parties three months prior to its expiration, which, under its terms, was on June 30, 1992.

While Airsystems alleges that it sent Governor Coleman a letter, dated March 10, 1992, timely notifying ASG of its intent to renew the SPIA lease, such a letter was never tendered into evidence at trial. ASG did, however, offer into evidence a letter signed by the Attorney General on March 18, 1992, which acknowledged receipt of a March 2, 1992, letter from Wray. This letter, which was copied to Governor Coleman, the Treasurer, and Director of Port Administration, notified Airsystems that the SPIA lease was terminated as of March 31, 1992.

Airsystems, on the other hand, argues that the Attorney General's March 18 notice of termination letter had no legal effect since it was not signed by Governor Coleman; that as a result, ASG's final position on the SPIA lease was that stated in Governor Coleman's letter of December 29, 1992, that annulled the Attorney General's earlier cancellation notice. Airsystems maintains that this gubernatorial correspondence not only rescinded the Attorney General's emergency cancellation of the SPIA lease, but also extended its leasehold interest for another fifteen year term.

■ We find no merit to this analysis. Where a lease uses the term "renewal" it means that the original lease expires at its term and upon agreement of the parties, it may be renewed through the execution of a new lease." *Felder v. Hall Bros. Co.*, 235 S.W. 789, 790 (Ark. 1921) (the stipulation in a lease to renew requires the making of a new lease, whereas, one to extend does not). Governor Coleman's December 29, 1992 letter neither evidences a renegotiation of a renewal of the lease nor could it have amounted to a lease agreement, since it further fails to evidence necessary terms. At the same time, the letter, if it can be construed as a renewal of the lease, was never filed with the Territorial Registrar. Accordingly, Governor Coleman's letter did not constitute a renewal of the SPIA lease nor did it effectively result in a *nunc pro tunc* rescission of the lease's termination nine months earlier by the Attorney General.

■ In addition, any renewal or extension of the lease for a term 10 years or more requires the Fono's approval. *See* A.S.C.A. § 37.2030. Since this statute was enacted in 1978, it did not apply to the original SPIA lease

executed in 1977.[10] It did, however, apply to any leasehold of ASG property executed after 1978. The Fono never approved an extension of the SPIA lease. It was, therefore, not renewed for a further term of fifteen years. Thus, even if we could hold that the SPIA lease was valid, it would have terminated under its own terms since Airsystems had not only failed to renew the SPIA lease but it also failed to properly conclude a new one in accordance with statutory mandate.

## IV. General Release and Settlement Agreement

ASG agreed to pay Airsystems $280,000 as the result of two separate settlement instruments. The first, dated September 7, 1989, and styled "General Release of All Claims and Settlement Agreement," is nothing more than a self serving declaration on the part of Airsystems,[11] stipulating, among other things, to the release of ASG from any and all "claims and actions" which Airsystems may have against ASG for "mistakenly enter[ing] into and execut[ing] a 5-year lease of [the hangar property] to [SamAir] without [Airsystems'] consent." This document further recites ASG's acknowledgment of the continuing validity of Airsystems' claims to the hangar property, as SPIA's assignee.

The second settlement instrument, styled "Agreement In Settlement," dated March 7, 1991, reflects an agreement by ASG to pay Airsystems the sum of $280,797 for the hangar structure which was destroyed by Hurricane Ofa on February 2, 1990.

ASG's negotiation of this settlement is highly suspect and even irresponsible in the light of this Court's prior judicial pronouncements in *Samoa Aviation*, 11 A.S.R.2d 144, that the SPIA lease, upon which Airsystems based its claims to the hangar property, was terminated automatically during the bankruptcy proceeding, *id.* at 145; and that the SamAir lease was valid and enforceable, *id.* at 153. Given these holdings, the deferential and generous posture taken by the Attorney General's office in favor of Airsystems, and against the tax payer, thereby committing ASG to the payment of public funds, is bewildering to say the least.

---

[10] The SPIA lease was executed one year prior to the passage of A.S.C.A. § 37.2030 in 1978, which requires that any lease of government land for a period of ten years or more be submitted to the Fono before it may become effective.

[11] The General Release of All Claims and Settlement Agreement was executed by Wray on behalf of Airsystems and merely "witnessed" by Assistant Attorney General Arthur Ripley "for the Attorney General."

Notwithstanding an unambiguous declaration by the High Court of American Samoa that the SamAir lease on the hangar property was valid and enforceable, the Attorney General's office nonetheless committed ASG to concede and agree to the payment of damages upon the astonishing recital that "[ASG had] mistakenly entered into and executed a 5-year lease . . . to [SamAir]," and that Airsystems as "owner" of the hangar property was to be paid the sum of $280,797 for, among other things, "[ASG's] conversion and use of the [hangar property]."

Furthermore, these settlements are also highly questionable in view of the fact that Article VII of the SPIA lease provided that "[a]ll permanent improvements [which would include the hangar] to the premises shall become the property of [ASG] the Lessor." Now given the destruction of the hangar structure by what was essentially an intervening act of God, we were not able to find anything whatsoever in the language of the SPIA lease obligating ASG to either restore or to be liable for damage and destruction to any permanent improvements on the premises, attributable to *vis major*.

We conclude that Airsystems' claim to the hangar property, based on the assignment of the invalid and ineffectual SPIA lease, is equally invalid and ineffectual. Accordingly, the resulting settlement instruments premised on Airsystems' groundless claims to the hangar property are equally found to be invalid and ineffectual, and thus present no impediment whatsoever to ASG's rights as owner, to deal with the hangar property as it sees fit.

## CONCLUSIONS AND ORDER

On the foregoing, we hereby declare the following:

1) That the SPIA lease is invalid and of no effect;

2) That SPIA's taking possession of the hangar property and ASG's acceptance of rental payments from SPIA created a tenancy at will relationship;

3) That the tenancy at will, along with any right, interest, or title SPIA may have to the hangar property, has terminated;

4) That the Quitclaim Deed, assigning the SPIA lease to Airsystems, is itself invalid and of no legal effect;

5) That neither SPIA nor Airsystems has any remaining right, title, or

interest in and to the hangar property, nor in and to any improvements made thereon; and,

6) That ASG as owner of the hangar property is otherwise free to deal with the said property as it sees fit.

Judgment shall enter accordingly.

It is so ordered.